## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## VALDOSTA DIVISION

**CHRISTOPHER MATTHEW BESSINGER,**

      Plaintiff,

v.                                   Civil Action No. 7:14-CV-116 (HL)

**INVESTIGATOR JOHN MULVANEY, JR.;
SERGEANT TERESA FISHER;
CORPORAL BRANDON TINSLEY; and
the CITY OF REMERTON, GEORGIA**,

      Defendants.

## ORDER

Before the Court is Defendants' Motion for Summary Judgment. (Doc. 28). After reviewing the pleadings, briefs, affidavits, and other evidentiary materials presented, the Court **GRANTS** summary judgment on Plaintiff's claims asserted against Defendants Teresa Fisher, Brandon Tinsley, and the City of Remerton. The Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion as it relates to Plaintiff's claims against Defendant John Mulvaney, Jr.

## I.    FACTUAL BACKGROUND

### Events Preceding Police Encounter

The parties do not materially dispute the initial sequence of events. July 22, 2012 began uneventfully for Plaintiff Christopher Matthew Bessinger ("Bessinger"). Bessinger, who at that time was enlisted in the United States Air

Force and stationed at Moody Air Force Base in Valdosta, Georgia, had recently undergone surgery to repair a work-related injury to his left shoulder. (Doc. 23, p. 17, 21-22, 70; Doc. 37-1, ¶¶ 3, 6). He spent the majority of the afternoon in his apartment with his wife Nastassia Cueto Bessinger ("Nastassia") and his friend Cody Nunn ("Nunn") playing video games. (Doc. 23, p. 105; Doc. 37-1, ¶ 4). Between approximately 3:30 or 4:00 p.m. and 9:00 p.m., Bessinger consumed three to five Bud Light beers. (Doc. 23, p. 106; Doc. 24, p. 15).

Sometime between 9:00 and 10:00 p.m., Bessinger, along with Nastassia and Nunn, left the apartment to go to Buffalo Wild Wings. (Doc. 23, p. 107; Doc. 24, p. 17). Bessinger consumed one, maybe two, two Bud Lights. (Doc. 23, p. 109; Doc. 24, p. 18). The group remained at the restaurant for approximately one hour before departing for Milltown, a bar located in the City of Remerton.[1] (Doc. 23, p. 107; Doc. 24, p. 19). Upon arriving at Milltown, the bar was crowded, so Bessinger, Nastassia, and Nunn made the decision to go to the back porch. (Doc. 23, p. 116; Doc. 24, p. 21). While Nunn stood in line at the outside bar to purchase beers for himself and Bessinger, Bessinger excused himself to go to the restroom. (Doc. 23, p. 117).

When Bessinger returned to the porch, Nastassia was not present. (Doc. 23, p. 117). Bessinger asked Nunn where his wife had gone. (Doc. 23, p. 117).

---

[1] Remerton is a self-described "city within a city," landlocked within the City of Valdosta. See http://cityofremerton.com.

Nunn informed him that Nastassia went to retrieve her cigarettes from the car. (Doc. 23, p. 117; Doc. 24, p. 24). Bessinger attempted to call Nastassia to check on her, but the volume level of the surrounding environment made it difficult to communicate, so Bessinger decided to walk out to the parking lot to check on his wife. (Doc. 23, pp. 117-18). Bessinger walked out of the bar and headed toward the parking lot holding his open container of beer. (Doc. 23, p. 119, 121, 124-25; Doc. 37-1, ¶ 5). Any agreement between the parties relating to the facts in this case ends at this point.[2]

**Bessinger's Version of Events**

According to Bessinger, as he approached the parking lot, he made eye contact with Corporal Brandon Tinsley ("Tinsley") of the City of Remerton Police Department. (Doc. 23, p. 121-22, 124). Tinsley and Investigator John Mulvaney, Jr. ("Mulvaney")[3] called to Plaintiff to come over to them. (Doc. 23, p. 122); Doc.

---

[2] Corporal Brandon Tinsley, an officer employed by the City of Remerton who was involved in the series of events alleged in this case, activated the video camera located in his patrol car upon arriving at the scene. However, the participants in the situation underlying this lawsuit were standing at the back of the vehicle as the events unfolded, preventing the camera from capturing any of the alleged physical altercation. Only an audio recording of the incident exists, which the Court has reviewed and considered. (See Doc. 30, Compact Disc of In-Camera Video from Patrol Car).

[3] Mulvaney is a narcotics officer with the Lowndes County Sheriff's Department. (Doc. 22, p. 10; Doc. 27, ¶ 3). During the weekend of July 22, 2012, however, Mulvaney was "moonlighting" with the City of Remerton. (Doc. 22, p. 20; Doc. 27, ¶ 4). He earned $25 per hour to assist with crowd control around the restaurants and bars in the City of Remerton. (Doc. 22, p. 20).

37-1, ¶ 5). Tinsley informed Bessinger that he was in violation of the City of Remerton's open container ordinance and began writing Bessinger a ticket for the infraction. (Doc. 23, p. 122). Bessinger explained that he was not aware that it was illegal to have an open container of alcohol and apologized to the officers. (Doc. 23, p. 122; Doc. 37-1, ¶ 5). When Bessinger asked if he could return to the bar to dispose of the beer, Tinsley told him no and continued writing out a citation. (Doc. 23, p. 129-30). Bessinger then proceeded to pour out the beer and set the container on the ground by his and the officers' feet. (Doc. 23, p. 122, 130; Doc. 37-1, ¶ 5).

When asked for his identification, Bessinger produced both his South Carolina driver's license and his military identification. (Doc. 37-1, ¶ 5). Upon learning that Bessinger was in the military, Mulvaney purportedly remarked, "You guys think you can get away with everything just because you're military." (Doc. 23, p. 123; Doc. 37-1, ¶ 5). While Bessinger maintained a generally cordial rapport with Tinsley, tension with Mulvaney began to rise. (Doc. 23, p. 128). Bessinger was unable to provide his Valdosta address to the officers. (Doc. 23, p. 123). He and his wife had recently married and moved to a new apartment complex, and Bessinger could not recollect his new address. (Doc. 23, p. 123). He requested permission to reach into his pocket to retrieve his address or to consult with his wife, but the officers denied him permission to do so. (Doc. 23, p.

4

123, 136). Bessinger denies refusing to answer any of the officers' questions. (Doc. 23, p. 137).

While Tinsley continued to gather Bessinger's personal information for the citation, Bessinger claims that Mulvaney became increasingly aggressive toward him. (Doc. 23, p. 123). At some point, Mulvaney asked Bessinger "what the fuck [he] was looking at." (Doc. 23, p. 123; Doc. 37-1, ¶ 6). Then, without provocation, Mulvaney said, "I'm going to fuck you up," (Doc. 30, Compact Disc of In-Camera Video from Patrol Car at 1:54), and charged at Bessinger, striking him in the face. (Doc. 23, p. 124, 144, 147, 158; Doc. 37-1, ¶ 7). Bessinger states that Mulvaney "grabbed me by the back of my polo shirt and he pulled me closer and then he fell backwards. And he continued to hit me in my sides, on my back, the back of my sides. And I had bruises there. And that's when I got handcuffed." (Doc. 23, p. 124, 148; Doc. 37-1, ¶ 7).

Bessinger admits that after Mulvaney cursed at him, he "was a little pissed off" himself. (Doc. 23, p. 137). However, Bessinger denies cursing at either Tinsley or Mulvaney or clinching his fists or assuming any sort of threatening posture. (Doc. 23, p. 138, 141-42; Doc. 37-1, ¶ 6). He further denies making any type of aggressive movement toward Mulvaney. (Doc. 23, p. 142; Doc. 37-1, ¶ 9). His hands and arms remained close to his body. (Doc. 23, p. 142-43). Bessinger explains "that [it] would be kind of pointless for me to even try to get in a fight with

a cop knowing that I'm injured, you know. It doesn't make sense." (Doc. 23, p. 143; Doc. 37-1, ¶ 6).

Bessinger states that he was dazed by the initial blow to the face. (Doc. 23, p. 148). He never resisted and never fought back. (Doc. 23, p. 148, 150; Doc. 37-1, ¶ 9). When Bessinger attempted to get up, he asked Mulvaney, "Why did you do that? Why did you do that? Why did you do that? You hit me for no reason." (Doc. 23, p. 148-49, 151-52). But Mulvaney continued holding and punching him; he would not release Bessinger. (Doc. 23, p. 150). Eventually, Mulvaney got on top of Bessinger, handcuffed him behind his back, and placed him under arrest. (Doc. 23, p. 150-51, 152). At that point, Bessinger said something to the officers about having recently undergone shoulder surgery. (Doc. 23, p. 168). He requested that Mulvaney stop jerking his shoulders, but Mulvaney persisted, pulling Bessinger up by his shoulders while handcuffed. (Doc. 37-1, ¶ 8). Despite Bessinger's complaint about pain in his shoulders, none of the officers examined his injuries or offered him medical care. (Doc. 37-1, ¶¶ 8, 11). Bessinger admits that he did not notice the presence of Sergeant Teresa Fisher[4] until after his altercation with Mulvaney. (Doc. 23, p. 131).

---

[4] Fisher, like Mulvaney, was an employee of the Lowndes County Sheriff's Department who occasionally worked for the City of Remerton on the weekends to assist with crowd control. (Doc. 27-1, ¶¶ 3, 5).

After his arrest, Bessinger was placed in the car of another Lowndes County Sheriff's deputy who was called to the scene. (Doc. 23, p. 162). This unnamed officer transported Bessinger to the Lowndes County jail. (Doc. 23, p. 162). Upon arriving at the jail, Bessinger informed officials that his face was hurt and his shoulder injured. (Doc. 23, p. 167). He denies receiving any medical care other than ice during the three days he spent in jail. (Doc. 37-1, ¶¶ 11, 12). Bessinger ultimately underwent surgery to repair damage to both of his shoulders, which he contends was the direct result of Mulvaney's physical assault. (Doc. 37-1, ¶ 8).

### Defendants' Version of Events

The three officers relay a different account of the events that transpired on July 22, 2012. The officers claim that Mulvaney and Fisher, not Tinsley, made first contact with Bessinger. (Doc. 21, p. 13, 15; Doc. 22, p. 22; Doc. 26, p. 33; Doc. 27-1, ¶ 5; Doc. 27-2, ¶ 6; Doc. 27-4, ¶ 7). While on foot patrol in the Remerton Square parking lot, Mulvaney and Fisher encountered Bessinger, who was holding an open container of beer. (Doc. 22, p. 22; Doc. 26, p. 33; Doc. 27-4, ¶ 7). Mulvaney advised Bessinger of the open container violation and asked that Bessinger dispose of the beverage. (Doc. 22, p. 22). Bessinger poured out the beer and placed the container by Mulvaney's foot. (Doc. 22, p. 22). When

Mulvaney informed Bessinger that he now was littering, Bessinger "started getting smart-mouthed, smart alecky." (Doc. 22, p. 22).

Mulvaney requested Bessinger's driver's license, at which time Bessinger produced his military identification rather than his license. (Doc. 22, p. 23). According to Mulvaney, Bessinger was visibly intoxicated and was being evasive. (Doc. 22, p. 24). Around this time, Tinsley arrived. (Doc. 22, p. 23). Tinsley, who was patrolling the area in his police vehicle, previously noticed Bessinger crossing the street with an open container of beer. (Doc. 21, p. 13-14). Tinsley observed Bessinger, Mulvaney, and Fisher standing in the parking lot with an open beer bottle sitting on the ground. (Doc. 21, p. 16). Tinsley then began the process of issuing Bessinger a citation for violating the City of Remerton's open container ordinance. (Doc. 21, p. 16; Doc. 22, p. 23). Bessinger was reluctant to answer Tinsley's questions regarding his name, date of birth, and address. (Doc. 21, p. 17; Doc. 22, p. 24, 27-28). At one point, Tinsley requested that Bessinger not curse when addressing him and warned Bessinger, "Keep your mouth shut. When I ask you questions, you answer. You're turning something very minor into something a long way out of [course]." (Doc. 30, Compact Disc of In-Camera Video from Patrol Car at 1:33, 1:35).

Mulvaney asserts that as Tinsley continued completing the citation form, Bessinger began mumbling and staring at Mulvaney and assumed a "pre-assault

indicator" posture, closing his fists and positioning himself in a "bladed" or fighting stance. (Doc. 21, p. 21; Doc. 22, p. 28, 31). Mulvaney asked Bessinger, "What are you fuckin' staring at?" (Doc. 30, Compact Disc of In-Camera Video from Patrol Car at 1:53).[5] Bessinger balled his fists up at his side. (Doc. 22, p. 29; Doc. 26, p. 36). Based on his experience, Mulvaney believed that Bessinger was preparing himself to fight. (Doc. 22, p. 29, 35; Doc. 27-2, ¶¶ 7-8). When Bessinger started moving his hips, Mulvaney stepped in to restrain Bessinger to prevent Bessinger from assaulting him. (Doc. 22, p. 32; Doc. 27-2, ¶ 9). Mulvaney explained that as he moved to attempt to take Bessinger to the ground, he tripped and fell forward. (Doc. 22, p. 32). Then, as Mulvaney turned around, Bessinger jumped on Mulvaney and began assaulting Mulvaney with his fists. (Doc. 21, p. 22-23; Doc. 22, p. 32-33; Doc. 26, p. 35-36). Mulvaney then proceeded to lock Bessinger in a triangle lock, wrapping his legs around Bessinger to bring Bessinger's body closer to his in an attempt to prevent Bessinger from striking him further. (Doc. 22, p. 32). Once Mulvaney was able to right himself, Bessinger again became combative. (Doc. 22, p. 37). Mulvaney was able to turn Bessinger onto his stomach and, with the assistance of Tinsley and Fisher, secure Bessinger in handcuffs. (Doc. 22, p. 37). At some point during

---

[5] Mulvaney does not deny using expletives during his interchange with Bessinger. Mulvaney testified during his deposition that in his "experience dealing with people under the influence [if] you use some type of bravado, nine times out of ten it [will] de-escalate the situation." (Doc. 22, p. 36).

this process, Mulvaney struck Bessinger in the ribs in an attempt to free Bessinger's arms from underneath his body. (Doc. 22, p. 38). Neither Fisher nor Tinsley struck Bessinger at any time. (Doc. 22, p. 38). The entire skirmish lasted a matter of seconds.   (See Doc. 30, Compact Disc of In-Camera Video from Patrol Car, 1:54-1:58).

In the immediate aftermath of the altercation between Bessinger and Mulvaney, Tinsley recalls seeing some swelling to Bessinger's eye. (Doc. 21, p. 28). However, neither Tinsley, Mulvaney, nor Fisher remembers Bessinger complaining about any other injuries, and they did not note any obvious afflictions to Bessinger's shoulders that warranted immediate medical attention. (Doc. 21, p. 28; Doc. 22, p. 38-39; Doc. 27-2, ¶ 13; Doc. 27-4, ¶ 12). Fisher remembers Bessinger asking not to be pulled up because of a shoulder injury but never heard Bessinger request medical care. (Doc. 26, p. 34, 37).

### Criminal Charges and Trial

It is undisputed that Mulvaney placed Bessinger under arrest. (Doc. 27-2, ¶ 11). Mulvaney charged Bessinger with felony obstruction of a law enforcement officer in violation of O.C.G.A. § 16-10-24(b). (Doc. 27-2, ¶ 11). A Lowndes County Grand Jury later returned an indictment charging Bessinger with

obstruction along with open container under O.C.G.A. § 40-6-253. (Doc. 37-5).[6] Following a trial held on February 4, 2014, a jury found Bessinger not guilty of the offense of obstruction. (Doc. 37-4, p. 127).

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and … the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A genuine issue of material fact arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of a material fact." Celotex, 477 U.S. at 323 (internal quotation omitted). If the movant meets this burden, the burden shifts to the party opposing summary judgment to go beyond the

---

[6] The Lowndes County District Attorney filed a Motion to Enter Nolle Prosequi as to the open container violation on February 5, 2014, which the Superior Court granted that same day. (Doc. 37-6).

pleadings and present specific evidence showing that there is a genuine issue of material fact, or that the movant is not entitled to judgment as a matter of law. Id. at 324-26. This evidence must consist of more than conclusory allegations. See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). In sum, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

## III.   DISCUSSION

### A.   Section 1983 Claims Against the Individual Defendants

Defendants Tinsley, Mulvaney, and Fisher move for summary judgment on Bessinger's claims brought pursuant to 42 U.S.C. § 1983 and alleging that the three officers violated his constitutional rights under the Fourth, Eighth, and Fourteenth Amendments by employing excessive force; conducting an unreasonable search and seizure of his person; conspiring to maliciously prosecute him; and denying him adequate medical care. Construing the facts in a light most favorable to Bessinger as the nonmoving party, the Court concludes that summary judgment is proper as to each of Bessinger's § 1983 claims asserted against Defendants Tinsley and Fisher. However, upon concluding that a genuine issue of fact exists concerning the reasonableness of the force exerted

by Defendant Mulvaney, the Court grants in part and denies in part Defendant Mulvaney's motion for summary judgment.

### 1.   Excessive Force

Mulvaney argues that there is no genuine dispute of fact whether he employed excessive force in violation of the Fourth Amendment when he physically restrained Bessinger. According to Mulvaney, any use of force was objectively reasonable. Mulvaney further contends that to the extent that the circumstances he confronted with Bessinger led him to conclude that a degree of force was necessary to subdue Bessinger, he is protected by qualified immunity. Tinsley and Fisher argue that they are entitled to summary judgment on Bessinger's excessive force claim because there is no evidence that they made any physical contact with Bessinger beyond that required to place Bessinger in the patrol car after his arrest.

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." Lee v. Ferraro, 284 F.3d 1188, 1198 (citing Graham v. Connor, 490 U.S. 386, 394-95 (1989)). "A genuine 'excessive force' claim relates to the manner in which an arrest was carried out, independent of whether law enforcement had the power to arrest." Hadley v. Guitierrez, 526 F.3d 1324, 1329 (11th Cir. 2008) (citing Bashir v. Rockdale Cty., Ga., 445 F.3d 1323, 1332 (11th

Cir. 2006)). An officer's use of force is excessive under the Fourth Amendment if the use of force was "objectively [un]reasonable in light of the facts and circumstances confronting" the officer. Graham, 490 U.S. at 397. This standard takes into account that "police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Id. at 396-97.

At the summary judgment stage, a court cannot "simply accept the officer's subjective version of events, but rather must reconstruct the event in the light most favorable to the non-moving party and determine whether the officer's use of force was excessive under those circumstances." Fils v. City of Aventura, 647 F.3d 1272, 1288 (11th Cir. 2011). In evaluating the necessity of the force, the court should examine "'(1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.'" Id. (quoting Brown v. City of Huntsville, Ala., 608 F.3d 724, 738 (11th Cir. 2010)). "[G]ratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force." Hadley, 526 F.3d at 1330; see also Saunders v. Duke, 766 F.3d 1262, 1265 (11th Cir. 2014).

Viewing the relevant facts in the light most favorable to Bessinger, the force exerted by Mulvaney was excessive. In the early morning hours of July 22, 2012, Bessinger admittedly exited Milltown, a bar located within the City of Remerton, holding an open container of beer. When approached by the law enforcement officers, Bessinger apologized for the infraction and asked if he simply could return to the bar. When the officers denied that request, Bessinger cooperated as the officers gathered his personal information and issued him a citation for violating the city's open container ordinance, an extraordinarily minor infraction that otherwise placed no other citizens or law enforcement officers at risk of harm.

Mulvaney is the one responsible for escalating the tenor of the conversation. From Bessinger's perspective, Mulvaney viewed Bessinger as a target upon learning of Bessinger's enlistment in the Air Force, commenting that military personnel think that they can get away with anything. Mulvaney likewise is the one who began spewing expletives, accusing Bessinger of not being able to "answer a fuckin' question straight" and saying that Bessinger was "about to piss me off." (Doc. 30, Compact Disc of In-Camera Video from Patrol Car at 1:15, 1:18).

As Bessinger leaned against the patrol car and waited for Tinsley to complete the citation form, Mulvaney turned to Bessinger and asked, "What are

you fuckin' staring at," to which Bessinger responded, "What are you staring at me for?" (Doc. 30, Compact Disc of In-Camera Video from Patrol Car 1:53). Mulvaney then shouted that Bessinger had picked the wrong person to mess with and exclaimed, "I'm going to fuck you up!"  (Doc. 30, Compact Disc of In-Camera Video from Patrol Car at 1:54). Mulvaney then launched himself at Bessinger, striking him in the eye and taking him down to the ground where he continued punching Bessinger in his sides.

Crediting Bessinger's version of events, under which he never made any aggressive movement toward Mulvaney and was otherwise compliant with the officers' requests for information, Mulvaney's use of force was gratuitous and excessive. The officers initially stopped Bessinger for violating the City of Remerton's open container ordinance, which is not a serious offense. Further, Bessinger, who denies assuming any threatening posture or attempting to physically assault Mulvaney, did not present a threat to the safety of Mulvaney or any other person. There also is no evidence that Bessinger attempted to resist or evade arrest. Accordingly, a reasonable jury, accepting Bessinger's version of events as true, could conclude that Mulvaney's unprovoked use of force against an otherwise non-hostile suspect violated Bessinger's Fourth Amendment rights.

The Court cannot reach the same conclusion as to Defendants Tinsley and Fisher. Even viewing the facts in the light most favorable to Bessinger, there is

16

no evidence that Tinsley or Fisher exerted any force against Bessinger. Bessinger recalls having no physical interaction with either of these officers and did not even realize that Fisher was present until after his altercation with Mulvaney came to an end. At most, Fisher potentially assisted with handcuffing Bessinger after Mulvaney restrained him on the ground, and Tinsley placed Bessinger in his patrol car while awaiting backup from the Lowndes County Sheriff's Department. It thus cannot be said as a matter of law that Tinsley or Fisher employed disproportionate force, and Bessinger's excessive force claims against them must fail.[7]

## 2.   Qualified Immunity

Mulvaney asserts that his actions are shielded by qualified immunity. "Qualified immunity offers complete protection for individual public officials performing discretionary functions 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person

_____

[7] In his response to Defendants' motion for summary judgment, Bessinger argues that Tinsley and Fisher are jointly responsible for Mulvaney's excessive use of force as co-conspirators. However, Bessinger never alleged in his Complaint that Tinsley and Fisher conspired with Mulvaney to apply disproportionate force, nor is there any evidence in the record to suggest that such a conspiracy ever formed (or that the law even recognizes such a claim). The Court, therefore, has not considered this newly-derived theory of recovery. The Court further notes that Bessinger has not raised a separate § 1983 claim for failure to intervene. See Crenshaw v. Lister, 556 F.3d 1283, 1294 (11th Cir. 2009) (noting that when an officer "did not violate [the suspect]'s right to be free from excessive force," his partner "had no attendant obligation to intervene").

would have known.'" <u>Sherrod v. Johnson</u>, 667 F.3d 1359, 1363 (11th Cir. 2012) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)). The purpose of qualified immunity is to permit government officials to carry out their discretionary duties without fear of personal liability or harassing litigation and to protect from suit "all but the plainly incompetent or one who is knowingly violating the federal law." <u>Lee</u>, 284 F.3d at 1193 (quotation and citations omitted). In order to receive the benefit of qualified immunity, the public official first "must prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" <u>Courson v. McMillian</u>, 939 F.2d 1479, 1487 (11th Cir. 1991) (quoting <u>Rich v. Dollar</u>, 841 F.2d 1558, 1563 (11th Cir. 1988)). "Once discretionary authority is established, the burden then shifts to the plaintiff to show that qualified immunity should not apply." <u>Edwards v. Stanley</u>, 666 F.3d 1289, 1294 (11th Cir. 2012) (quotation and citation omitted).

Courts apply a two-step test to evaluate a claim of qualified immunity. First, a court must ask, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" <u>Saucier v. Katz</u>, 533 U.S. 194, 200-02 (2001). "When a district court considers the record in this way, the court has the plaintiff's best case before it. With the plaintiff's best case in hand, the court is able to move the question of whether the defendant committed the constitutional violation alleged in the

18

complaint without having to assess any facts in dispute." <u>Robinson v. Arrugeta</u>, 415 F.3d 1252, 1257 (11th Cir. 2005). Second, the court must determine whether that constitutional right was "clearly established" such that a reasonable officer should have known that his conduct violated the plaintiff's constitutional rights. <u>Id.</u> "Both elements must be satisfied for an official to lose qualified immunity." <u>Grider v. City of Auburn, Ala.</u>, 618 F.3d 1240, 1254 (11th Cir. 2010).

It is undisputed that Mulvaney was acting within his discretionary authority, and, as explained above, the Court has concluded that a reasonable jury could find that Mulvaney violated Bessinger's constitutional rights by using excessive force. Therefore, Mulvaney is entitled to the protection of qualified immunity only if the law was not clearly established that his conduct was unlawful.

Clearly established law must provide a defendant with "fair warning" that his conduct deprived a plaintiff of a constitutional right. <u>Hope v. Pelzer</u>, 536 U.S. 730, 739-41 (2002). A plaintiff "can demonstrate that the contours of the right were clearly established in several ways." <u>Terrell v. Smith</u>, 668 F.3d 1244, 1255 (11th Cir. 2012). The first is to show that "a materially similar case has already been decided." <u>Id.</u> (quotation and citation omitted). Alternatively, a plaintiff can point to a "broader, clearly established principle [that] should control the novel facts [of the] situation." <u>Id.</u> (quotation and citation omitted). "Finally, the conduct involved in the case may 'so obviously violate[ ] th[e] constitution that prior case

law is unnecessary." Id. (citation omitted).   "[E]xact factual identity with a previously decided case is not required, but the unlawfulness of the conduct must be apparent from preexisting law." Coffin v. Brandau, 642 F.3d 999, 1013 (11th Cir. 2011).

Regardless of the method applied in this case, it is clear that Mulvaney should have known that to attack Bessinger, who was temporarily detained for a minor infraction, without provocation violated Bessinger's Fourth Amendment rights. The facts in this case are sufficiently similar to other cases where courts have concluded that force was excessive where the suspect was non-violent and has not resisted arrest. See Fils, 647 F.3d at 1292 (qualified immunity denied where officers tased plaintiff who committed a minor offense, did not resist arrest, did not threaten anyone, and did not disobey any instructions) (citing Vinyard v. Wilson, 311 F.3d 1340 (11th Cir. 2002) (finding use of pepper spray excessive where plaintiff, who had threatened no one, was handcuffed and in the back of the police car); Priester v. City of Rivera Beach, Florida, 208 F.3d 919 (11th Cir. 2000) (finding force excessive where officer released his attack dog on plaintiff even though plaintiff had been compliant and was lying on the ground)); see also Hadley, 526 F.3d at 1333-34 (holding that the law is clearly established that a handcuffed, non-resisting, and otherwise compliant person has a "right to be free from excessive force") (collecting cases).

Even though the facts in this case are not identical to those recited in <u>Fils</u>, <u>Vinyard</u>, <u>Priester</u>, or <u>Hadley</u>, given that Bessinger was not handcuffed until after the physical encounter with Mulvaney concluded, the evidence presented by Bessinger, if believed by a jury, is sufficient to establish that Bessinger did not make any movement that would otherwise pose a safety threat to Mulvaney or others and did not resist or attempt to evade arrest at any time. Under the circumstances here presented, Mulvaney thus had fair warning based on clear precedent to inform him that his unprovoked attack on Bessinger violated Bessinger's clearly established constitutional right to be free from the application of excessive force. Accordingly, Mulvaney is not entitled to qualified immunity on Bessinger's excessive force claim.

### 3.    Unlawful Search and Seizure

Defendants next move for summary judgment on Plaintiff's vague contention that Defendants made an unreasonable seizure of his person in violation of the Fourth and Fourteenth Amendments. It is difficult to discern the exact nature of Plaintiff's search and seizure claim. While Paragraph Two of Plaintiff's Complaint states that Defendants made an unreasonable seizure of his person, the Complaint does not specify how Defendants specifically violated Plaintiff's constitutional right not to be subject to an unreasonable seizure. (Doc. 1). Further, Plaintiff did not allege a separate count claiming that he was subject

to an unlawful seizure when Defendants arrested him. In responding to Defendants' motion for summary judgment, however, Plaintiff implies only that the seizure occurred through the application of force and does not argue that Defendants lacked probable cause for the arrest. (Doc. 37, p. 12). The Court will analyze the claim accordingly.

Because this claim as presented entails the question of whether the law enforcement officers subjected Bessinger to excessive force in the course of his arrest, Bessinger's allegations are properly analyzed under the "objective reasonableness" standard of the Fourth Amendment rather than under the Fourteenth Amendment's substantive due process standard. Graham, 490 U.S. at 388, 394. "The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." Lee, 284 F.3d at 1197 (citing Graham, 490 U.S. at 394-95). The Supreme Court has held that "[d]etermining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." Graham, 490 U.S. at 396 (quoting Tennessee v. Garner, 471 U.S. 1, 8 (1985) (internal quotations omitted)).

22

As alleged, and as defended in the context of the motion pending before the Court, Bessinger's Fourth Amendment search and seizure claim is essentially duplicative of his excessive force claim and does not warrant further analysis. Accordingly, for the same reasons discussed in the context of Bessinger's excessive force claim, the Court concludes that summary judgment is proper as to Defendants Tinsley and Fisher. The Court denies summary judgment as to Defendant Mulvaney.

### 4.   Conspiracy to Maliciously Prosecute[8]

In Count IV of his Complaint, Bessinger asserts a claim against Defendants for conspiracy to maliciously prosecute, alleging that Defendants Mulvaney, Fisher, and Tinsley "agreed, conspired, and acted in concert to falsely and maliciously initiate a criminal prosecution of Plaintiff." (Doc. 1, ¶ 44). Bessinger specifically avers that the three officers "fabricated evidence, suppressed exculpatory evidence, misled prosecutors, and presented knowingly false testimony and statements with the improper purpose of procuring said criminal prosecution." (Doc. 1, ¶ 45). As a result of this conspiracy, Bessinger

---

[8] It is unclear from Bessinger's Complaint whether he intended to allege his count for malicious prosecution under § 1983 or under state law. Defendants have moved for summary judgment on this count under the guise of federal law, and Bessinger has responded in kind. Therefore, the Court, likewise, treats Bessinger's malicious prosecution claim as arising under § 1983.

was indicted and tried for the crime of felony obstruction of a law enforcement officer, an offense for which a jury found him not guilty. (Id.).

While the Eleventh Circuit "has identified malicious prosecution as a violation of the Fourth Amendment and a viable constitutional tort cognizable under § 1983," Wood v. Kesler, 323 F.3d 872, 881 (11th Cir. 2003), the fatal flaw in the presentation of Bessinger's claim is that he has submitted no evidence that the three officers in any way acted in concert to pursue his prosecution. "[T]o sustain a conspiracy action under § 1983, . . . a plaintiff must show an underlying actual denial of [his] constitutional rights." GJR Invs., Inc. v. Cty. of Escambia, Fla., 132 F.3d 1359, 1370 (11th Cir. 1998), overruled on other grounds in Randall v. Scott, 610 F.3d 701, 706 (11th Cir. 2010). Additionally, the plaintiff must prove that the defendants reached an understanding to deny the plaintiff's constitutional rights. See Bendiburg v. Dempsey, 909 F.2d 463, 469 (11th Cir. 1990); see also Baily v. Bd. of Cty. Comm'rs of Alachua Cty., 956 F.2d 1112, 1122 (11th Cir. 1992) ("the linchpin for conspiracy is agreement, which presupposes communication"). "[A]n agreement may be inferred from the relationship of the parties, their overt acts and concert of action, and the totality of their conduct." Am. Fed'n of Labor & Cong. of Indus. Orgs. v. City of Miami, 637 F.3d 1178, 1192 (11th Cir. 2011).

Bessinger points to no evidence of any agreement, either explicit or implicit, between the Defendants in support of his conspiracy theory. Bessinger's argument that the three officers conspired together rests primarily on his assertion that there are inconsistencies and misstatements in the incident reports prepared by each officer following the events of July 22. However, Bessinger's argument works against him, instead highlighting the fact that these officers worked for two different law enforcement agencies and clearly did not discuss the information submitted in their reports. The lack of communication between the three is further noted in the fact that Mulvaney and Tinsley, who both had the opportunity to view the recording from the evening's events, later corrected their reports to remove certain inaccuracies while Fisher, who never heard the audio recording until trial, did not. In the absence of evidence of any agreement among the Defendants to take any action against Bessinger, Bessinger's conspiracy claim must fail as a matter of law.

As to Plaintiff's assertion that Defendants conspired to provide false or perjured testimony during the course of the criminal trial, Defendants are entitled to absolute immunity. Joyce v. Adams, 2007 WL 2781196, at *7 (S.D.Ga. Sept. 20, 2007) (citing Williams v. Dykes, 317 Ga. App. 665 (1984)). The Supreme Court explains,

> A police officer on the witness stand performs the same functions as any other witness; he is subject to compulsory process, takes an oath, responds to questions on direct examination, and may be prosecuted subsequently for perjury. . . . Subjecting government officials, such as police officers, to damages liability under § 1983 for their testimony might undermine not only their contributions to the judicial process but also the effective performance of their other public duties.

Briscoe v. LaHue, 460 U.S. 325, 342-42 (1983); see also Rehberg v. Paulk, 611 F.3d 828, 838 (11th Cir. 2010).

### 5.    Denial of Medical Care

Bessinger claims that following his physical encounter with Mulvaney, he requested medical care. Despite his supplication for medical treatment, Bessinger alleges that Defendants denied him care, thereby violating his rights under the Eighth and Fourteenth Amendments. As a pretrial detainee, Plaintiff's rights arise under the due process clause of the Fourteenth Amendment rather than under the Eighth Amendment. Mann v. Taser Intern., Inc., 588 F.3d 1291, 1306 (11th Cir. 2009) (citing City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 244 (1983)). Regardless, the Court must scrutinize Plaintiff's claim of deliberate indifference as though it had been asserted under the Eighth Amendment. Id. To support a claim of deliberate indifference to a serious medical need, a plaintiff must present proof of three elements: "(1) that he had an objectively serious medical need; (2) that the defendant acted with deliberate indifference to that need; and (3) that the deliberate indifference caused the

plaintiff's injury." Jones v. Rutherford, 546 Fed.App'x 808, 810 (11th Cir. 2013) (citing Goebert v. Lee Cnty., 510 F.3d 1312, 1326 (11th Cir. 2007)).

A serious medical need is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Mann, 588 F.3d at 1307 (quoting Hill v. DeKalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994), *overruled in part on other grounds by* Hope v. Pelzer, 536 U.S. 730, 739 (2002)). Alternatively, "a serious medical need is determined by whether a delay in treating the need worsens the condition." Id. The Eleventh Circuit has explained "that a successful constitutional claim for 'immediate or emergency medical attention' requires 'medical needs that are obvious even to a layperson because they involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem. In contrast, delay or even denial of medical treatment for superficial, nonserious physical conditions does not constitute' a constitutional violation." Fernandez v. Metro Dade Police Dep't, 397 Fed.App'x 507, 511-12 (11th Cir. 2010) (quoting Hill, 40 F.3d at 1187-88). An arrestee "who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." Id. (quotation marks omitted).

First, the undisputed evidence shows that while Bessinger might have complained to the officers that he had recently undergone surgery to his shoulder, he never requested medical care in the immediate aftermath of his altercation with Mulvaney. Bessinger even testified in his deposition that he did not inform law enforcement personnel that he desired medical assistance until he arrived at the Lowndes County jail. (Doc. 23, p. 167). By that time, none of the Defendants were present, and they cannot be held accountable for actions that the jail staff may or may not have undertaken on Bessinger's behalf.

Second, Bessinger has not demonstrated an objectively serious medical need. Bessinger complains that as a result of Mulvaney's attack, he suffered bruising to his torso, a black eye, and damage to his shoulders. The only one of these purported injuries that might have been apparent to a layperson is the black eye. Even if Bessinger can later demonstrate to the jury that the blow to his eye resulted in permanent damage to his vision, an otherwise superficial injury like a black eye would not have alerted the officers that Bessinger required emergency medical care. The same can be said for any alleged damage to Bessinger's shoulders, an injury that was not life-threatening and to a lay person to not warrant the immediate attention of a doctor. Finally, the affidavit provided by Bessinger's surgeon does not confirm that Bessinger had an objectively serious medical need at the time of his arrest or by virtue of the delay between

28

his arrest and his receipt of medical care. For these reasons, the Court grants Defendants' motion for summary judgment on Bessinger's § 1983 claim for denial of medical care.

### 6.    City of Remerton

Bessinger claims that, prior to July 22, 2012, the City of Remerton maintained policies or customs that ultimately led to the violation of Bessinger's constitutional rights. Specifically, Bessinger asserts that the City failed to supervise and to train its law enforcement officers and to investigate adequately citizen claims of police misconduct. These oversights by the City, according to Bessinger, permitted law enforcement officials, including the individual Defendants named in this lawsuit, to act without fear of any disciplinary repercussions. Defendants in response state that there is no evidence supporting Bessinger's claim that the City of Remerton maintained any policy or practice of deliberate indifference that in turn caused a deprivation of Bessinger's constitutional rights. The Court agrees with Defendants.

The law is well established that a municipality cannot be held liable for a § 1983 violation premised on a *respondeat superior* theory of liability; rather, the municipality must itself cause the constitutional violation. Skop v. City of Atlanta, 485 F.3d 1130, 1145 (11th Cir. 2007) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694-95 (1978)). "A city may only be held liable under 42 U.S.C. § 1983

when the injury caused was a result of municipal policy or custom." Lewis v. City of West Palm Beach, Fla., 561 F.3d 1288, 1293 (11th Cir. 2009). "[I]t is generally necessary to show a persistent and wide-spread practice" to support the existence of a policy or custom. Depew v. City of St. Mary's, 787 F.2d 1499 (11th Cir. 1986).

A municipal policy or custom may include a failure to provide adequate training provided the deficiency "evidences a deliberate indifference to the rights of its inhabitants." City of Canton v. Harris, 489 U.S. 378, 388 (1989). However, a city "is not automatically liable under [§]1983 even if it inadequately trained or supervised its police officers and those officers violated [a plaintiff's] constitutional rights. Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998). The Supreme Court has instructed that an allegation of a failure to train or supervise can be the basis for liability under § 1983 only in the "limited circumstance" where "the municipality inadequately trains or supervises its employees, this failure to train or supervise is a city policy, and that city policy causes the employees to violate a citizen's constitutional rights." Id. (citing City of Canton, 489 U.S. at 387 ("[M]unicipal liability under § 1983 attaches where – and only where – a deliberate choice to follow a course of action is made from among various alternatives by city policymakers. Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality – a 'policy' as defined by our

prior cases – can a city be liable for such a failure under § 1983.") (internal quotation marks omitted)). "[W]ithout notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train and supervise." Id. at 1351.

The crux of Bessinger's custom or policy claim against the City of Remerton is that Tinsley issued Bessinger a citation on an old citation form listing the old ordinance number for an open container violation.[9] Prior to 2008, the open container ordinance could be found at Section 01-11-02 of the City of Remerton's Code of Ordinances. In 2008, the code was amended, and that particular violation then was enumerated as Section 6-6. There is no evidence that the substance of the ordinance changed such that Bessinger could affirmatively argue that his original detention was inappropriate, only that the text of the ordinance could be found in a renumbered section City's code. Subsequently, Bessinger's contention that the ordinance itself is unconstitutional is unfounded and cannot support Bessinger's claims against the City of Remerton. Finding no evidence that the error in the code section violated

---

[9] In his Complaint, Bessinger raises claims against the City of Remerton for failure to train and failure to supervise. However, Bessinger has wholly failed in responding to Defendants' motion for summary judgment to address these claims or to present any evidence in support thereof. The Court accordingly considers those claims abandoned.

Bessinger's constitutional rights, the Court accordingly grants the City of Remerton's motion for summary judgment.

### B.   State Law Claims

#### 1.   False Arrest

Under Georgia law, "[a]n arrest under process of law, without probable cause, when made maliciously, shall give a right of action to the party arrested." O.C.G.A. § 51-7-1. The law provides that "[m]alice may be inferred from a total lack of probable cause." Jones v. Warner, 301 Ga. App. 39, 41 (2009). "Lack of probable cause shall exist when the circumstances are such as to satisfy a reasonable man that the accuser had no ground for proceeding but his desire to injure the accused. Lack of probable cause shall be a question for the jury, under the direction of the court." O.C.G.A. § 51-7-3. However, where, as here, an arrest has been carried to prosecution, an action for malicious prosecution becomes the exclusive remedy. Pombert v. Glock, Inc., __ F.Supp.3d__, 2016 WL 1057043, at *3 n. 35 (N.D.Ga. March 16, 2016) (citing Perry v. Brooks, 175 Ga. App. 77, 78 (1985)). Bessinger's state law claim for false arrest is accordingly barred.

#### 2.   False Imprisonment

O.C.G.A. § 51-7-20 defines the intentional tort of false imprisonment as "the unlawful detention of the person of another, for any length of time, whereby such person is deprived of his personal liberty." See also Fields v. Kroger Co.,

202 Ga. App. 475 (1992) ("The essential elements of the cause of action for false imprisonment are detention of the person of another for any length of time, and the unlawfulness of that detention."). A claim for false imprisonment does not require a showing of malice. Smith v. Holeman, 212 Ga. App. 158, 159-60 (1994). "The defendant has the burden to prove the arrest was lawful, and when the arrest was without warrant he must show one of the exigent circumstances listed in O.C.G.A. § 17-4-20(a)." Id. at 160.

Defendants initially detained Bessinger for a lawful purpose: an admitted violation of the City of Remerton's open container violation. However, Bessinger's eventual arrest for felony obstruction of a law enforcement officer was affected by Mulvaney alone. Tinsley and Fisher played no role in the arrest and, therefore, are entitled to summary judgment on Bessinger's claim of false imprisonment.[10] However, the Court denies Mulvaney's motion for summary judgment on Bessinger's state law claim for false imprisonment. Because a fact question remains regarding whether Bessinger provoked Mulvaney's alleged attack, the Court cannot conclude as a matter of law that Bessinger's arrest for felony obstruction of a law enforcement officer was lawful.

---

[10] Bessinger again attempts weakly to impose the actions of Mulvaney on his two co-defendants under a theory of conspiracy. However, Bessinger has made no effort to flesh out how Tinsley or Fisher conspired to falsely imprison Bessinger or to present even a single piece of evidence to support that theory. The Court finds the argument meritless and will pay it no further regard.

### 3.    Assault and Battery

In general, under Georgia law "[a]ny act of physical violence (and the law will not draw a line between different degrees of violence), inflicted on the person of another, which is not necessary, is not privileged, and which constitutes a harmful or offensive contact, constitutes an assault and battery." Brown v. Super Discount Markets, Inc., 223 Ga. App. 174, 175 (1996) (quoting Greenfield v. Colonial Stores, 110 Ga. Ap. 572, 574-75 (1964)) (internal quotation marks omitted). "A police officer assaults a person by attempting an unlawful arrest with force." Smith, 212 Ga. App. at 160. Where an officer makes a lawful arrest, the officer still may use no more force than is reasonably necessary under the circumstances. Id. (citing Bennett v. State, 169 Ga. App. 85, 86 (1983) ("Even though a law enforcement officer has a legal right to make an arrest, he can use no more force than is reasonably necessary under the circumstances, and cannot use violence disproportionate to the resistance offered.")).

For the same reason Bessinger's excessive force claim against Defendants Tinsley and Fisher fails, so must his state law claim for assault and battery fail. There simply is no evidence that either of these officers made physical contact in a remotely violent nature with Bessinger. However, as discussed in the context of Bessinger's § 1983 claim of excessive force against

Mulvaney, a material question of fact exists regarding the reasonableness of the force exerted by Mulvaney which must be left to a jury.

### 4.   Official Immunity

"Under Georgia law, county law enforcement officers are entitled to official immunity from suit and liability unless they '. . . act with actual malice or an intent to injure when performing a discretionary act.'" Speight v. Griggs, 579 Fed.App'x 757, 759 (11th Cir. 2014) (quoting Roper v. Greenway, 294 Ga. 112, 113 (2013)), and (citing Ga. Const. art. I., §2, para. IX(d)). "Actual malice requires more than harboring bad feelings about another," Adams v. Hazelwood, 271 Ga. 414, 415 (1999), but does not include "implied malice" or a showing of "the reckless disregard for the rights or safety of others," Murphy v. Bajjani, 282 Ga. 197, 203 (2007). Rather, actual malice refers to "a deliberate intention to commit a wrongful or illegal act," Tittle v. Corso, 256 Ga. App. 859, 862 (2002), that "may be accomplished with or without ill will and whether or not injury was intended," Adams, 271 Ga. at 415. "A deliberate intention to do wrong such as to constitute the actual malice necessary to overcome official immunity must be the intent to cause the harm suffered by the plaintiff[ ]." Selvy v. Morrison, 292 Ga. App. 702, 704 (2008).

Because the Court has already determined that each of Bessinger's state law claims against Tinsley and Fisher fail as a matter of law, the Court need not

determine whether these two Defendants are entitled to official immunity. As to Mulvaney, however, if a jury believes Bessinger's version of events, the jury may reasonably determine that Mulvaney deliberately intended to cause harm to Bessinger when Mulvaney physically attacked him without provocation. Mulvaney thus is not entitled to the protection of official immunity.

### 5.    Sovereign Immunity

Bessinger's Complaint does not specify whether he is suing the individual Defendants in their personal or official capacities. To the extent that Bessinger intends to pursue claims against these Defendants in their official capacities for any injury he allegedly suffered, the Defendants are immune from suit. Suits against "'public employees in their official capacities are in reality suits against the state and, therefore, involve sovereign immunity.'" Cameron v. Lang, 274 Ga. 122, 126 (2001) (quoting Gilbert v. Richardson, 262 Ga. 744, 750 (1994)). "The doctrine of sovereign immunity . . . protects all levels of governments from legal action unless they have waived their immunity from suit." Id. Any waiver of sovereign immunity must be demonstrated by the party who seeks to benefit from the waiver. Butler v. Carlisle, 299 Ga. App. 815, 818 (2009). Bessinger has offered no evidence that sovereign immunity has been waived. Therefore, any state law claims Bessinger asserts against Defendants in their official capacities are barred.

### C.    Punitive Damages

The individual Defendants next move for summary judgment on Plaintiff's claim for punitive damages. Defendants argue that that "there is no evidence that they acted with willful misconduct, malice, wantonness, or entire want of care." (Doc. 27, p. 20).[11] Punitive damages are available against government officials sued in their individual capacities under § 1983. City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 268-70 (1981). In order to recover punitive damages, Bessinger must demonstrate that Mulvaney, the only Defendant against whom any of Bessinger's claims remain, was "motivated by evil motive or intent" or that his conduct "involve[d] a reckless or callous indifference to the federally protected rights" of Plaintiff. Smith v. Wade, 461 U.S. 30, 56 (1983). Assuming that a jury finds Bessinger's version of events meritorious, the jury conceivably could determine that Mulvaney was callously indifferent toward Bessinger's federally protected rights. The Court accordingly denies Mulvaney summary judgment on Bessinger's claim for punitive damages as it relates to his surviving § 1983 claims.

---

[11] The City of Remerton also points out that as a general rule punitive damages may not be assessed against a municipality absent express statutory authorization. See City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 260 n. 21 (1981). While this Defendant's recitation of the law is correct, Plaintiff pled his claim for punitive damages against only the individual Defendants, thus rendering the City of Remerton's motion on this point superfluous.

Bessinger's Complaint appears to assert a claim for punitive damages only in relation to his § 1983 claims. However, to the extent that Bessinger intends to seek punitive damages in connection with his state law claims, the Court concludes that Mulvaney is not entitled to summary judgment. Under O.C.G.A. § 51-12-5.1(b), "[p]unitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." Here, there is a genuine issue of fact whether Mulvaney acted with actual malice; therefore, Bessinger's claim for punitive damages underlying his state law claims survives summary judgment. See Crowley v. Scott, No. 5:14-CV-326 (MTT), 2016 WL 2993174, at *9 (M.D.Ga. May 23, 2016) (citing Fields v. Atlanta Indep. Sch. Sys., 916 F.Supp.2d 1348, 1375 n. 44 (N.D.Ga. 2013) ("[B]ecause a genuine question exists as to whether [the defendant] acted with [actual] malice, [the plaintiff's request for punitive damages survives summary judgment.")).

### D.    Attorney's Fees

Defendants' argument that they are entitled to summary judgment on Bessinger's claim for attorney's fees rests on their general position that Bessinger's § 1983 claims against all Defendants fail. As the Court has

38

discussed in detail, the Court finds that issues of material fact exist that warrant permitting the majority of Bessinger's civil rights claims against Defendant Mulvaney to proceed to trial. Should Bessinger prevail on those claims, the law authorizes an award of attorney's fees. 42 U.S.C. § 1988(b) (authorizing an award of attorney's fees to the prevailing party in a civil rights action filed pursuant to § 1983).

### E.   Medical Care Recovery Act

In Count IX of his Complaint, Bessinger asserts a claim for the reasonable value of past and future medical care and treatment under the Medical Care Recovery Act ("MCRA"), 42 U.S.C. §§ 2651-2653. Bessinger alleges that as a result of the injuries he purportedly sustained at the hands of Defendants, he received medical and hospital care and treatment furnished by the United States. He now seeks recovery of those expenses on behalf of, and with the express authorization of, the Government.

The MCRA provides that where the Government is authorized or required to provide medical treatment to an individual injured as the result of the tortious conduct of a third party, the Government shall have the right to recover "the reasonable value of the care and treatment so furnished, to be furnished, paid for, or to be paid for . . . against such third person." 42 U.S.C. § 2651(a). In order to enforce its right of recovery, the Government may either intervene or join in an

39

action brought by the injured person against the third party who is liable for the injury or, if the injured party does not file suit within six months after the first day the Government provides care or treatment, the Government may institute legal proceedings against the third party. 42 U.S.C. § 2651(d). The Act further provides that the head of the department or agency of the United States furnishing care to the injured party may require the injured person "to assign his claim or cause of action against the third person to the extent of that right or claim." 42 U.S.C. § 2651(a).

Defendants move for summary judgment on Bessinger's claim for recovery under the MCRA based only on their contention that Bessinger's claims arising under § 1983 and state law fail as a matter of law. Because the Court here concludes that summary judgment is inappropriate as to Bessinger's claims against Defendant Mulvaney, the Court must likewise deny summary judgment as to the MCRA claim. However, the Court notes its concern that Bessinger has not presented sufficient evidence that the Government has granted him the right to enforce its claim. The Court therefore requests that the parties be prepared to argue why Bessinger should or should not be permitted to pursue the Government's right to recovery at the pretrial conference.

## VI.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** summary judgment as to each of Plaintiff's claims asserted against Defendants Tinsley, Fisher, and the City of Remerton. The Clerk is directed to enter judgment in favor of those three Defendants. The Court **GRANTS** Defendant Mulvaney's motion for summary judgment on Plaintiff's § 1983 claims for conspiracy to maliciously prosecute and denial of medical care as well as on Plaintiff's state law claim for false arrest. However, the Court **DENIES** summary judgment on Plaintiff's remaining claims against Defendant Mulvaney, and those issues shall proceed to trial.

**SO ORDERED**, this the 22nd day of August, 2016.


*s/ Hugh Lawson*
**HUGH LAWSON, SENIOR JUDGE**

aks

41